Alright, hear ye, hear ye, hear ye. This Honorable Appellate Court of the 2nd District is back in session. Pursuant to adjournment, the Honorable Robert D. McLaren presides. Please be seated. Your Honor, the second case of the morning, Clause 211 of Code 369, Deerfield, Milwaukee, LLC v. Mackie Consultants, LLC, on behalf of the Appellant, Mr. David Drank, on behalf of the Appellee, Mr. Paul A. Drank. Thank you, Mr. Drank. Good morning, Justices. Good morning. May it please the Court, David Drank of the U.S. and Cohen, Highland Park. This is a mortgage foreclosure. There was a loan in 2004. Originally, that loan matured in 2005, and subsequently there were six replacement notes. Each time the note would mature, a new note was used as payment of the prior note. There was never a payment with funds being transferred to the bank to pay off the loan. It was an extension by new notes. Also, the amounts of the loan increased, apparently based on equity in the property. On the third modification, the mortgage was then modified to increase the loan. At that time, the mortgage was expressly extended, the maturity date, to January 2, 2027. Thereafter, the note matured. Again, we had the process of the notes maturing, the new note being given as payment for the last note, and the amounts changing. This occurred repeatedly until June 2, 2009. Going back a little bit, I think we have to look at the whole course of events leading up to June 2. The first mortgage modification had a maturity date of 1-2-27. Correct. The statement of uncontested facts that was filed pursuant to local rule indicated that was a scrivener's error. It should have been 1-2-07. You never responded to that until your post-judgment motion, I believe, or motion to reconsider, correct? We did. Local Rule 2.04b allows for a statement consisting of numbered paragraphs of any additional facts that require the denial of summary judgment. Do not deny that the document says what it says, that Earl O'Golden, I've forgotten his name, that the bank vice president claims that it was a scrivener's error. Don't deny that those claims were made. But what we do have is loan documents with various maturity dates. All of which were two years? Some were even shorter. There's none that were anywhere close to? No, no, there weren't. And I believe that they didn't continue modifying. They didn't change the mortgage each time either to reflect the new maturity date to coincide with that of the promissory notes. And I think it was anticipated that there were going to be various extensions until this property was developed and sold off. So the admission of that extrinsic evidence to explain the different maturity dates, in fact, the maturity date that would have been in the, had the clerical error not been made, was in 2007. And the loan was extended several times. In 2008, it was extended twice. And in 2009, it was extended twice. So it was extended a number of times after the clerical error date of 2007 as opposed to 2027. The last note matured on 6-2-0-9. Correct. The mortgage secured the note. Correct. A default on the note would be a default, I mean, could result in a foreclosure on the mortgage. That's correct. So what difference does it make if it's 2007 or, you know, 500 years in the future? If the note is defaulted. Well, the rule against perpetuity says it'll be less than 100 years. I don't think that's in effect anymore. We had to learn that in law school, and I think they did away with it because we're trying to keep jobs and using them. Well, 500 years is quite a long time. I'm just saying, whether it's 2007 or some other year, 07, if the mortgage can be foreclosed upon a default of the note itself, and that note clearly, well, there's some evidence at least that it was defaulted on as of 6-2, what difference does it make whether it's a 2007 or not? Well, I think you need to have unambiguous documents to grant summary judgment. You can apply rules of contract construction to resolve those, but you only do that to determine the parties' intent, where there's an ambiguity that's already existing. So we also have an ambiguity with respect to the right-to-cure provision, different in the note than in the mortgage. Counsel cites some rules of contract construction saying that the note should apply. Again, that's another ambiguity. The real issue here is what was the event of default and whether there was a notice of the event of default and allowing for a time for the cure to be taken. The events of default that are alleged in the complaint are mechanics lien. The mechanics lien was recorded on August 28th of 2008. After that mechanics lien was recorded, in December of 2008, there was a replacement note. On 2-5-09, the mechanics lien complaint was filed. After that complaint was filed, on March 2nd of 2009, the seventh replacement note was executed and then matured on June 2nd of that year. Was the mechanics lien the only basis for the default? Well, that's one of the alleged events of default. And I think by waiting for over a year and a half after the recording of the mechanics lien, I don't believe that to be the event of default, which is why the bank called in the loan. How do you respond to the 6-12-09 letter from the bank vice president as being evidence of default? I don't believe it is evidence of default. And in our statement of facts under 204-B-3-B, what we state is, with respect to that notice, the letter never says you are in default. You're being notified that you're in default. And so that we now know the default interest rate is triggered, we now know that any time the cure provided in the loan documents is starting to run, no use of the word default. What we're told is, sorry, Village Bank will require, I'm sorry, I lost it, I lost it. Oh, here it is. I don't believe it is. What we said in our response is, the only notice of default, although their rule 204-B says there were, prior to the maturity, multiple times, or after the bank sent notice to CanDeal and its counsel, CanDeal is default under the mountain mortgage, they cite to Mr. Goldman's affidavit. His affidavit cites to Exhibit 1, which is the June 12th letter of Ms. Lavin. And her letter states somewhere, and I think it's important, the language of the letter, which I can't seem to put my finger on. Here it is. This corresponds in regard to your maturity loan from the vacant property. It's not the first time that the loan matured, by the way. It's the seventh time. I've recently received and reviewed an appraisal order by Attorney James Meores. This appraisal reflected a different value than the appraisal order using a WinTrust-approved appraisal. Unfortunately, I need to use a value provided by the bank-approved appraiser. Now, she refers to a prior conversation that the borrower's intention to either sell the property or move it to another lender by refinancing. Please provide me the details regarding this proposed action. Since your loan has passed due and matured, again, we're not calling it in and we're not saying it's a default. If you need to request additional extension of maturity, here's what we're going to require. We're going to need, because of our new appraisal, and the market value of the property was dropping and the new appraisal came back, we now need to pledge additional collateral or pay down the loan in the amount of about $300,000 to get the bank's loan-to-value ratio in compliance with the 80% guidelines of the federal regulations. She goes on to say that we're going to require that you fund an interest reserve for the maturity period you're requesting, as well as make the past due interest payments and late fees of $17,000 and some odd dollars. Please contact me to discuss your plans and make your loan current. That's what happened next. Mr. Lewis was in communication with her. The request for the $17,000 was complied with within the timeframe provided in Ms. Lavin's letter to bring past due interest and late fees current. We're now working on negotiating an extension of the maturity date with the bank. With a different bank, right? Well, we were trying to get an extension with the bank, but at the same time, we've got it on the market and we're trying to get it refinanced. We're trying to do whatever we can to satisfy this loan. That correspondence you just referred to was not offered until after the court granted summary judgment, correct? No. In part, correct. The letter that Mr. Lioris stated June 23rd in forwarding the payment of $17,000 to the bank was in the record at the time of the granting summary judgment. The correspondence and emails that transpired thereafter came in afterwards. Although you may not want to consider it or not feel it's appropriate to consider it in the context of the original grant of summary judgment, in counsel's brief, they raise the issue of—and they're free to do it. You can argue anything to uphold the trial court's decision as the appellee. And he argues the—I forget the name of it—the credit agreement act, which requires writings to extend installments or extend an existing credit agreement. Because this was raised in the appellate court for the first time, I would at least ask you to consider the correspondence and the payoff statement, which was signed by the bank employee as complying with the—or a credit agreement act, which wasn't raised before Judge Kaufman. Those are two different animals, statute or the act itself, as opposed to facts. We can take judicial notice of legal statutes and rules. Correct. But you're asking us to argue facts that were not part of the record at the time the court granted summary judgment. No, but at the time the court granted summary judgment, it wasn't based on the credit agreement act. That wasn't raised at that time. And you are correct. What I'm saying, to the extent that Your Honors consider the credit agreement act, I would then at least ask you to consider the documents attached to the post-trial motion, including the payoff letter with the non-default rate, at least for those purposes. One—a couple of things that the court did take into consideration in granting summary judgment was what was outlined in the statement of uncontested facts in support of the summary judgment that was never rebutted. And two of those things were that the note matured on 6-2-0-9—actually, three things— and that Kendila didn't pay, and the notice was sent under the terms of the notary mortgage, referring to the 6-12-0-9 meeting—or letter. So that was never rebutted. The notice that was sent was—the notice is Ms. Lavin's letter. Right. Our statement of uncontested facts, that doesn't say notice of default. It's talking about allowing us to extend the maturity date, things we need to do, and then after that, the $17,000 was paid, and there were negotiations after that. I think that raises a question of factors to whether that's a notice of default. What it says in the uncontested statement is prior to the maturity date and multiple times thereafter the bank sent notice to Kendila and its counsel of Kendila's default under the notary mortgage. And then it references the affidavit, which references this one notice. So when we have a pleading or an affidavit saying, here's some evidence, if the document is not what the conclusion about the document— if I plead a conclusion that this is a contract and I attach it to my complaint, if that's inconsistent with my conclusion, it negates the allegation of fact. I believe that the June 12th letter negates this allegation, especially in light of our uncontested facts that thereafter the $17,000 was sent and ongoing negotiations continued to try to extend the maturity date or to get the loan paid off. Was that my time? Yes, it was. Thank you, Justice. Thank you. Mr. Greco? Yes, thank you. Are you in any relation to Ryan Greco? I am not. Just for the record, he played Little League with me 40, 50 years ago, so— Was he good? He had a very good arm. You throw people out from right field. Maybe I am in relation to him. I think any conflicts of interest are attended with. If it may please the Court. I'm Paul Greco, and I'm with the law firm of Devontae & Lezak, LLC, in Park Ridge. With me today is my associate, Darren Sams, and Matt Darin of Deerfield, Milwaukee, LLC, the appellee lender. Here, the trial court determined that a summary disposition was permitted based upon the admissions in the record and the clear and unambiguous language of the loan documents. The trial court should be affirmed because contrary to the arguments raised in the appellant's briefs, there is no ambiguity regarding the maturity date of the loan. The lender did not waive the default, which occurred when the borrower failed to make the $1.4 million balloon payment on June 2, 2009. And finally, although not even required under the loan documents to do so, the borrower was provided an opportunity to cure that default, but failed to do so. As the Court noted earlier— Was there a cure provision? There is a cure provision. What is it? The cure provision does not—in the note—does not provide that there is any period of time to cure a non-monetary— excuse me, to cure a monetary default. So that would include, obviously, the balloon payment that became due on June 2, 2009. Does that conflict with the mortgage? It does. And the mortgage—it does not conflict with the mortgage because, actually, the mortgage speaks of general defaults and says there is a 15-day cure period, and that applies to— because the note is specific about monetary and non-monetary default, the general provision in the mortgage for the 15-day cure period would apply to things that weren't defined in the note. But to the extent that you wanted to apply the cure period in the mortgage, it would be 15 days after notice. The notice was given on June 12, 2009, and it's undisputed that there was no payment made, offered, and completed after that date. But before addressing— Within the 15 days or not at all? There was no payment within the 15 days, and then there was no payment thereafter, including in September of 2009. So regardless of which document you're talking about, it's immaterial? Correct. Correct. And the $17,000 wasn't a cure. It was an interest payment. It was not a cure. It was, in fact, interest payments for the months of April and May—excuse me, March, April, and May. So it may have cured—well, it was—for those months, it was the payments that he had failed to make in March, April, and May. So that would not be a cure of the balloon payment that became due on June 2, 2009, which was for over $1.4 million. Could you address the course of dealing argument that essentially the bank cried wolf several times in the past, and there were always modifications and extensions? I think first, as you pointed out, Your Honor, this argument, this course of conduct argument, was raised for the first time on the motion to—the post-trial motion to vacate some five months after the summary judgment ruling was entered. And I don't think it's appropriate for the court to consider it. It was supported by the September payoff letter, September 2009 payoff letter. And in that, the lender said, we'll accept the payoff and did not include default interest. Well, that was based upon the presumption that it was getting paid in September of 2009, some four months after the maturity date. That did not occur. Because it wasn't presented until the post-trial motion, I don't think we should consider it. But to the extent we do consider it, we need to look also at the mortgage and the note and the expressed terms of the mortgage and the note. Both the mortgage and the note indicate or contain no waiver clauses, which expressfully prohibit the borrower from relying on the lender's prior course of conduct. And both the mortgage and the note also contain a clause that says that no waiver will be implied. It must be in writing, which is consistent with the Credit Agreement Act that was referred to by counsel. And I think actually perhaps most telling, however, is that the affidavits that were finally submitted by the borrower in connection with the motion to vacate, those affidavits and none of them, did they express an intent that anyone believe that the loan did anything but mature on June 2nd, 2009? There's no expressed statement in any of these affidavits that either Mr. Lioris, the attorney, or Mr. Economy, the borrower's representative, had any belief or thought that the loan was going to mature in 2027, as they're attempting to indicate. In fact, Mr. Lioris indicates that in June of 2009, he was having ongoing negotiations with the bank. Ongoing negotiations do not indicate an agreement to waive a default or indicate a course of conduct that permits the inference of a waiver of the default. Can you respond to counsel's argument that the 612 letter was not noticed and that they did, in fact, contest that, as you outlined in your statement about contested debtors? They did not contest that in connection with the summary judgment motion. There's nothing stated in his statement about contested facts that indicates, oh, no, this was not a notice of default. So I disagree with that statement that he made. But to the extent of the letter, first look at the note in the mortgage. Nothing in the note in the mortgage describes exactly what a notice of default must say. All it needs to do is reasonably put you on notice that you're in default. Well, here, the June 12th letter clearly did that. If you look at the text of the letter, it specifically states, your loan is past due and matured. I don't know what else it needs to say to parlay to the borrower, this note is due, it's matured, and you owe it. So I think that was a proper notice, and I think it's clear by its own text. The mere fact that the borrower offered accommodations to the lender in that same letter, accommodations which included a $300,000 pay down, does not change the fact that it was a valid notice of default to them. I think it's significant, too, that the 2.04 statement that was filed by the lender indicates that's a notice of default. That indication is not refuted by the borrower with a short, concise response as required by 2.04b. Accordingly, as an operation of law, that is an admission, and that's what the trial court based its ruling on. And the trial court was entirely correct in basing its ruling on that. 2.04 is very clear. You must file responses. It's not optional. What's your response to Mr. Drink's argument that the deficiency judgment should be reduced? Mr. Drink's argument that the deficiency judgment should be reduced is based primarily on the notice of default. His argument that the June 12th notice wasn't valid, and therefore you couldn't start accruing default interest from June 2nd, 2009. It's also based on the fact that he claims that the June 2nd, 2009 default was waived. There's nothing in the record that supports a waiver of that default. What about the additional attorney's fees? The additional attorney's fees were entered at a time when the court had retained jurisdiction over this matter to consider Mr. Drink's post-trial motion. It wasn't after 30 days after the confirmation of the sale. It was during the period of time when Mr. Drink's post-trial motion was pending. What was the authority for granting attorney's fees? The authority for the fees is in the note, the mortgage, and the guarantee. Each contains an attorney's fees clause, and each specifically permits the award of attorney's fees in connection with the indebtedness guarantee, for instance, if we're speaking about the guarantee. Did the mortgage merge into the deed? It had the deed issued already? The deed had issued in the interim between the confirmation and the hearing on his post-trial motion, but certainly the court had retained jurisdiction at that time. It could have vacated the sale. It could have vacated the summary judgment motion. All of that was the relief specifically that Mr. Drink was requesting. Was the increased interest pursuant to the terms of the note? I think the note says something about additional 6% added upon failure to pay and maturity. Is that why the court went back to 6-2 instead of going to, say, 6-12, the notice, or 6-26, the cure that was at least allowed in the notice? Default interest was applied from 6-2 because that was the date of the default. And, again, under the note, there was no requirement of a notice when the default is a monetary default. So default interest became applicable immediately upon the failure to make the balloon payment, and that's standard in laser pro documents. In terms of the note? Yes. Okay. And that's standard in laser pro documents. Briefly, also, in regards to the attorney's fees, I am asking for the attorney's fees in connection with the appeal on this matter also. These are permitted as an awardable cost pursuant to the note, pursuant to the guarantee, and pursuant to the mortgage. Each has a clause specifically indicating fees in connection with the appeal. I would either ask for a hearing before this court on the reasonable fees or a remand solely for the issue of the awarding of additional attorney's fees associated with the presentation in preparation of the appeal of this matter. And I think, finally, the only thing I'd like to close with, and that we didn't touch on yet, is that the loan documents themselves, putting aside the 2.04 admissions, which are all the admissions that the trial court needed to grant summary judgment, but putting that aside, the loan documents themselves are what control the maturity date of the debt. As stated in March 1, Stover, the note is the evidence of the debt. The mortgage is given only as security, therefore. Accordingly, although a mortgage may supplement the terms of the note, the terms of the note must govern the date of maturity. Here, there is no ambiguity about the maturity date. The affidavits filed don't raise an ambiguity about the maturity date. Mr. Economy knew the maturity date. Mr. Lioris, his attorney, knew the maturity date. And the trial court in summary judgment was presented with all of this and ruled that there was no ambiguity in the loan documents and, therefore, no need to resort to extrinsic evidence. In fact, the trial court highlighted this, saying that the note controls the due date and, therefore, that no genuine issue of fact exists regarding that. Did Economy guarantee the last note that was the matured 6-2 of Oman? He executed a continuing guarantee. There was not an individual guarantee executed in March of 2009 when that promise setting note was executed. But the continuing guarantee would include all obligations, including replacement notes. Thank you, Your Honors. That's all. Thank you. Thank you. Mr. Crankin. Thank you, Justice. Just two things that I'd like to. Let me read verbatim from our 204B statement. Paragraph 6. Specifically, the last sentence, after I talk about the defective notice. Plaintiff neither in his June 12 correspondence of Cap Con 11 nor at any time thereafter advised defendant it was in default under the note or mortgages modified. I believe that's a pretty express denial of paragraph 15 of his 204A statement saying that we sent a notice of default. Is that refuted by the plain language of the 6-12-09 letter that counsel just read to us? The 6-12-09 letter isn't a notice of default. What it is is it's a notice under the mortgage that we have a right to cure. Here's what the mortgage says. If such a failure is curable and the grantor has not been given a notice of breach of the same provision of this mortgage within the preceding 12 months, it may be cured and no event of default will have occurred. If grantor, after a lender, sends written notice demanding cure, that's what her letter is. It's a written notice demanding cure of such failure. Cure of what? The breach, the default. But it's giving you the right, telling you you have a right to cure, but they're not calling it as a default. It's a breach. How can you have the right to fix something that isn't broken? Well, there's a breach, I agree, in event of default under the mortgage. But we're now being told we have a right to cure, and we have 15 days after the demand. Or if the cure requires more than 15 days, immediately initiate steps sufficient to cure the failure, and the after continues and completes the cure within a reasonably practicable time. Connie's letter talks about the efforts that we were going to undertake. We could ask for an extension of the maturity date. Then there's no default. Or she was aware that we were trying to refinance with another lender, and at the same time the property was listed. That's how the loan was going to be repaid this time. It had always been repaid with a promissory note. Did you allege or argue course of conduct before the motion reconsidered? The facts of the seven extensions, all of these facts were before the court. And from these facts, it can be inferred from this course of conduct that this was an opportunity to cure, that we were not in default until we were given an opportunity to cure. And her letter was merely providing us that opportunity. Course of conduct sounds to me like it's an equitable defense. Is it a legal defense? Or is it an equitable defense? I believe it's a foreclosure that may be entitled to raise an equitable defense. I'm sorry, say that again. This is a mortgage foreclosure. I'm relying on a provision of a mortgage. The remedy is to take the property and sell it, not a legal remedy. I believe that we're entitled to raise that. I'm talking about your claim that there's a course of conduct that would preclude relief being granted to the mortgagee. So if the mortgage and the note provides that there will be no waiver except in writing, then it seems that that's the only legal defense, which would suggest that if you're arguing course of conduct, the only way you could claim a legal defense is that the course of conduct was they signed a piece of paper that waived the issue. Or, based upon, I think, your more rational argument of course of conduct is it's based upon some equitable defense, which would either be estoppel or slumbering on the rights or laches or some more esoteric defense. So what I'm asking you is what is the nature of your claim that the course of conduct should grant you relief? In legal terms, waiver would be, I guess, an affirmative defense on a legal issue. Estoppel and waiver are very similar, and sometimes it's hard to distinguish. So I would say that. Well, no, not necessarily, because waiver is known relinquishment of a right, whereas an estoppel is based upon something that somebody does, which requires you or your client to rely thereon and change your position accordingly. That's what an estoppel is. I would choose estoppel. I understand my time is up. Okay, thank you very much. We'll take the case under advisement. We have another case to call at the issue of recess.